# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-3271

_____

Jane Does, 1-3; Planned Parenthood of Arkansas & Eastern Oklahoma, doing business as Planned Parenthood Great Plains,

*Plaintiffs - Appellees*,

v.

Cindy Gillespie,[1] Director of the Arkansas Department of Human Services,

*Defendant - Appellant.*

------------------------------

American Public Health Association; National Center for Lesbian Rights; National Family Planning & Reproductive Health Association; National Health Law Program; National Latina Institute for Reproductive Health; National Women's Law Center; Sexuality Information and Education Council of the U.S.,

*Amici on Behalf of Appellees.*

_____

No. 16-4068

_____

Planned Parenthood of Arkansas & Eastern Oklahoma, doing business as Planned Parenthood Great Plains; Jane Does, 1-3

*Plaintiffs - Appellees*,

---

[1]Cindy Gillespie is automatically substituted for her predecessor in these cases pursuant to Federal Rule of Appellate Procedure 43(c)(2).

v.

Cindy Gillespie, Director of the Arkansas Department of Human Services,

*Defendant - Appellant.*

_____

Appeals from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: September 21, 2016
Filed: August 16, 2017

_____

Before COLLOTON, MELLOY, and SHEPHERD, Circuit Judges.

_____

COLLOTON, Circuit Judge.

The Arkansas Department of Human Services terminated its Medicaid provider agreements with Planned Parenthood of Arkansas and Eastern Oklahoma after the release of controversial video recordings involving other Planned Parenthood affiliates. Planned Parenthood of Arkansas and Eastern Oklahoma could have challenged the termination through an administrative appeal and judicial review in the Arkansas courts, but it declined to do so. Instead, three Arkansas patients identified by the Planned Parenthood affiliate sued the Director of the Department under 42 U.S.C. § 1983, claiming that the Department violated a federal right of the patients under the Medicaid Act to choose any "qualified" provider that offers services that the patients seek.

The district court enjoined the Department from suspending Medicaid payments to Planned Parenthood of Arkansas and Eastern Oklahoma for services rendered to the three patients. The court later entered a broader injunction that forbids suspending payments for services rendered to a class of Medicaid beneficiaries. The Director appeals, and we conclude that the plaintiffs do not have a likelihood of success on the merits of their claims. The provision of the Medicaid Act does not unambiguously create a federal right for individual patients that can be enforced under § 1983. We therefore vacate the injunctions.

I.

Planned Parenthood of Arkansas and Eastern Oklahoma, an affiliate of the Planned Parenthood Federation of America, operates health centers in Arkansas. We will call the local affiliate "Planned Parenthood" for short. The district court found that the Arkansas health centers "provide family planning services to men and women, including contraception and contraceptive counseling, screening for breast and cervical cancer, pregnancy testing and counseling, and early medication abortion."

As of 2015, Planned Parenthood and the Arkansas Department of Human Services were parties to contracts under which Planned Parenthood participated in the Arkansas Medicaid program. The contracts provided that either party could terminate them without cause by giving thirty days' notice. The Department also could terminate the contracts immediately for several reasons, including for conduct that is sanctionable under the applicable Medicaid Provider Manual.

On August 14, 2015, Governor Hutchinson of Arkansas directed the Department to terminate its Medicaid provider agreements with Planned Parenthood. The Governor said in a public statement that it was "apparent . . . after the recent revelations on the actions of Planned Parenthood, that this organization does not

represent the values of the people of our state and Arkansas is better served by terminating any and all existing contracts with them." Context makes clear that the "recent revelations" to which the Governor referred were video recordings released by the Center for Medical Progress that purported to show employees of other Planned Parenthood affiliates discussing the sale of fetal tissue for profit. The parties dispute whether the Planned Parenthood affiliates involved in the recordings engaged in any unlawful or unethical conduct.

The Department, on August 14, 2015, notified Planned Parenthood that it was terminating the Medicaid provider agreements, effective thirty days later, and notified Planned Parenthood of its right to file an administrative appeal. Before the thirty days expired, on September 1, the Department sent a second notice. This one stated that the Department was terminating its agreements with Planned Parenthood for cause, because "there is evidence that [Planned Parenthood] and/or its affiliates are acting in an unethical manner and engaging in what appears to be wrongful conduct." Rather than discontinue the contracts immediately, however, the Department set the termination date for September 14, 2015, the same date specified in the first letter.

Federal regulations authorized by Congress and promulgated by the Secretary of Health and Human Services require each State to establish appeal procedures for Medicaid providers. 42 U.S.C. §§ 1396a(a)(4), (39); 42 C.F.R. § 1002.213. Under Arkansas law, a provider who is terminated has a right to file an administrative appeal within thirty days of the termination, and then to seek judicial review. Ark. Code R. § 016.06.35-161.400; Ark. Code Ann. § 20-77-1718. Planned Parenthood, however, declined to exercise its appeal rights under Arkansas law and instead identified three patients who were willing to join the organization in a federal lawsuit.

On September 11, 2015, Planned Parenthood and three patients identified as "Jane Does" sued the Department's Director in the district court, seeking a temporary restraining order and a preliminary injunction to prevent the Department from

terminating Planned Parenthood's contract. The plaintiffs alleged that they were likely to prevail on a claim that the Department, by excluding Planned Parenthood from the Medicaid program for a reason unrelated to its fitness to provide medical services, had violated § 23(A) of the Medicaid Act. This section is described as the Medicaid "free-choice-of-provider" provision. 42 U.S.C. § 1396a(a)(23)(A). The plaintiffs further asserted that without an injunction, they would suffer irreparable harm. The plaintiffs claimed that § 23(A) creates a judicially enforceable right, a violation of which can be remedied through an action under 42 U.S.C. § 1983. The district court granted a temporary restraining order.

After further briefing by the parties, Planned Parenthood withdrew its claim for relief as a provider, but the Jane Does proceeded with their claims as patients, and the district court granted a preliminary injunction in favor of the Jane Does. The court concluded that § 23(A) creates a private right enforceable by the Jane Does under § 1983, and that they were likely to prevail on the merits of their claim that the Department unlawfully terminated its contract with Planned Parenthood. The court also determined that, without an injunction, the Jane Does would suffer irreparable harm. The Department appealed the grant of the preliminary injunction, and we heard oral argument.

After the appeal was submitted, the district court granted the plaintiffs' motion to certify a class of "patients who seek to obtain, or desire to obtain, health care services in Arkansas at [Planned Parenthood] through the Medicaid program." The district court then issued a second, broader injunction that forbids the Department to suspend Medicaid payments to Planned Parenthood for services rendered to Medicaid beneficiaries who are members of the class. The district court's order granting the second injunction incorporated the court's reasoning from the first order.

The Department filed a notice of appeal of the class-wide preliminary injunction. The parties then filed a joint motion requesting that we consolidate the

two appeals, and they waived further briefing and argument. We consolidated the appeals and now consider them together.

## II.

A party seeking a preliminary injunction must demonstrate, among other things, a likelihood of success on the merits. *Munaf v. Geren*, 553 U.S. 674, 690 (2008). In this case, a threshold question bearing on likelihood of success is whether the Jane Doe plaintiffs and the certified class of Medicaid patients have a judicially enforceable right under the cited provision of the Medicaid Act, 42 U.S.C. § 1396a(a)(23)(A). If the statute does not create an enforceable federal right, then the Jane Does and the class members cannot sue under § 1983, and there is no likelihood of success on the merits.

Section 1983 provides a cause of action against any person who, under color of law, subjects a citizen to the deprivation of any rights secured by the laws of the United States. Generally speaking, § 1983 supplies the remedy for vindication of rights arising from federal statutes. *Maine v. Thiboutot*, 448 U.S. 1, 4-8 (1980). For legislation enacted pursuant to Congress's spending power, however, "the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 28 (1981).

To support an action under § 1983, a plaintiff relying on a federal law must establish that Congress clearly intended to create an enforceable federal right. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002). There was a time, illustrated by *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498 (1990), when the Medicaid Act was deemed to create an enforceable right if the provision in question was "intend[ed] to benefit the putative plaintiff." *Id.* at 509 (alteration in original) (quoting *Golden State*

*Transit Corp. v. City of L.A.*, 493 U.S. 103, 106 (1989)). Starting from that premise, *Wilder* held that the Boren Amendment to § 13(A) of the Medicaid Act created a federal right for providers that was enforceable under § 1983.

Later decisions, however, show that the governing standard for identifying enforceable federal rights in spending statutes is more rigorous. It is not enough, as *Wilder* and *Blessing v. Freestone*, 520 U.S. 329 (1997), might have suggested, to show simply that a plaintiff "falls within the general zone of interest that the statute is intended to protect." *Gonzaga*, 536 U.S. at 283. It is now settled that nothing "short of an unambiguously conferred right" will support a cause of action under § 1983. *Id.*

Most recently, therefore, the Court observed that Medicaid providers seeking to enforce § 30(A) of the Medicaid Act did not rely on *Wilder* to proceed under § 1983, because the Court's later decisions "plainly repudiate the ready implication of a § 1983 action that *Wilder* exemplified." *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1386 n.\* (2015). The Court explained that *Gonzaga* expressly rejected the notion, "implicit in *Wilder*," that something "short of an unambiguously conferred right" can support a cause of action under § 1983. *Id. Armstrong* thus made explicit what was implicit in *Gonzaga*, where the dissenting opinion concluded that the Court "*sub silentio* overrule[d] cases such as . . . *Wilder*," because the Boren Amendment did not "clear[ly] and unambiguous[ly] intend *enforceability under § 1983*." 536 U.S. at 300 n.8 (Stevens, J., dissenting) (second and third alteration and emphasis in original) (citation omitted). Congress repealed former § 13(A) and the Boren Amendment in 1997, *see* Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4711, 111 Stat. 251, 507-08, so the Court will have no occasion formally to overrule *Wilder*. But for purposes of our obligation to apply Supreme Court precedent, *see Agostini v. Felton*, 521 U.S. 203, 237 (1997), the Court's "repudiation" of *Wilder* is the functional equivalent of "overruling," as the Court uses the terms interchangeably. *Obergefell v. Hodges*, 135 S. Ct. 2584, 2606 (2015); *Keene Corp.*

-7-

*v. United States*, 508 U.S. 200, 215 (1993); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 864 (1992).[2]

The provision at issue in this case appears in a section of the Medicaid Act concerning state plans for medical assistance. The Act provides, with exceptions not relevant here, that the Secretary of Health and Human Services "shall approve any plan which fulfills the conditions specified in subsection (a)." 42 U.S.C. § 1396a(b). Subsection (a), in turn, declares that "[a] State plan for medical assistance must" satisfy some eighty-three conditions. The condition involved here is § 23(A), namely, that the state plan must "provide that . . . any individual eligible for medical assistance (including drugs) may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required . . . who undertakes to provide him such services." *Id.* § 1396a(a)(23)(A).

The Jane Does contend that § 23(A) creates an enforceable federal right for individual patients to receive services from any provider who is "qualified to perform the service" that they seek. If Planned Parenthood is qualified to perform the service, they argue, then § 1983 provides a remedy through which a court can require the State to maintain its contract with Planned Parenthood, so that the Jane Does can obtain assistance from that provider.

We see significant difficulties with the contention that § 23(A) unambiguously creates an enforceable federal right. First, the focus of the Act is two steps removed

_____

[2]*Pediatric Specialty Care, Inc. v. Arkansas Department of Human Services*, 293 F.3d 472 (8th Cir. 2002), cited by the dissent, *post*, at 24, 26-27, preceded *Gonzaga* and did not consider whether the statutory provisions at issue there unambiguously conferred an enforceable right on the plaintiffs. *Center for Special Needs Trust Administration, Inc. v. Olson*, 676 F.3d 688 (8th Cir. 2012), also cited by the dissent, did not apply *Gonzaga*, was decided before *Armstrong*, and concerned a different provision of the Medicaid Act that is not at issue here.

from the interests of the patients who seek services from a Medicaid provider. Like the provision at issue in *Armstrong*, "[i]t is phrased as a directive to the federal agency charged with approving state Medicaid plans, not as a conferral of the right to sue upon the beneficiaries of the State's decision to participate in Medicaid." 135 S. Ct. at 1387 (plurality opinion). In other words, "[i]t focuses neither on the individuals protected nor even on the funding recipients being regulated, but on the agenc[y] that will do the regulating." *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001). A statute that speaks to the government official who will regulate the recipient of federal funding "does not confer the sort of '*individual* entitlement' that is enforceable under § 1983." *Gonzaga*, 536 U.S. at 287 (quoting *Blessing*, 520 U.S. at 343). Even where a subsidiary provision includes mandatory language that ultimately benefits individuals, a statute phrased as a directive to a federal agency typically does not confer enforceable federal rights on the individuals. *Univs. Research Ass'n, Inc. v. Coutu*, 450 U.S. 754, 756 n.1, 772-73 (1981).

Second, Congress expressly conferred another means of enforcing a State's compliance with § 23(A)—the withholding of federal funds by the Secretary. 42 U.S.C. § 1396c. Congress also authorized the Secretary to promulgate regulations that are necessary for the proper and efficient operation of a state plan. *Id*. § 1396a(a)(4). Under that authority, the Secretary has required States to give providers the right to appeal an exclusion from the Medicaid program. 42 C.F.R. § 1002.213.[3] Because other sections of the Act provide mechanisms to enforce the

---

[3]It was foreseeable that federal regulations would provide for state administrative and judicial review of provider exclusions, because Congress specified that the Secretary may exclude from any *federal* health care program a provider who is excluded by a State. 42 U.S.C. § 1320a-7(b)(5). The collateral federal consequences of a State exclusion led the Secretary to mandate that States afford due process protections to excluded providers. *See* Health Care Programs: Fraud and Abuse; Amendments to OIG Exclusion and CMP Authorities Resulting From Public Law 100-93, 57 Fed. Reg. 3298, 3322-23 (Jan. 29, 1992).

State's obligation under § 23(A) to reimburse qualified providers who are chosen by Medicaid patients, it is reasonable to conclude that Congress did not intend to create an enforceable right for individual patients under § 1983. *See Suter v. Artist M.*, 503 U.S. 347, 360-61, 363 (1992), *superseded by statute on other grounds*, 42 U.S.C. §§ 1320a-2, 1320a-10; *see also Gonzaga*, 536 U.S. at 281 (applying *Suter*).

Accepting the Jane Does' position would result in a curious system for review of a State's determination that a Medicaid provider is not "qualified." Federal law, as noted, requires that when a State terminates a Medicaid provider, the State must afford the provider an opportunity for administrative appeal and judicial review in the state courts. Under the Jane Does' vision, while the provider is litigating its qualifications in the state courts, or after the provider unsuccessfully appeals a determination that it is not qualified, individual patients separately could litigate or relitigate the qualifications of the provider in federal court under § 1983. Each adjudicator must apply a rather imprecise standard, asking whether the provider is "qualified to perform the service or services required." The potential for parallel litigation and inconsistent results gives us further reason to doubt that Congress in § 23(A) unambiguously created an enforceable federal right for patients. *Cf. Gonzaga*, 536 U.S. at 292 (Breyer, J., concurring in the judgment).

Third, statutes with an "aggregate" focus do not give rise to individual rights. *Gonzaga*, 536 U.S. at 288 (quoting *Blessing*, 520 U.S. at 343). This court in *Midwest Foster Care & Adoption Ass'n v. Kincade*, 712 F.3d 1190 (8th Cir. 2013), reasoned that where "a statute links funding to substantial compliance with its conditions—including forming and adhering to a state plan with specified features—this counsels against the creation of individually enforceable rights." *Id*. at 1200. "Focusing on substantial compliance is tantamount to focusing on the aggregate practices of a state funding recipient." *Id*. at 1201; *see Gonzaga*, 536 U.S. at 288 (explaining that *Blessing* "found that Title IV-D failed to support a § 1983 suit in part because it only required 'substantial compliance' with federal regulations");

*Blessing*, 520 U.S. at 335, 343. The statute at issue in *Midwest Foster Care* concerned "payments on behalf of *each child*," 42 U.S.C. § 672(a)(1) (emphasis added), thus arguably suggesting a focus on individuals, but this court concluded that the "substantial compliance funding condition" indicated that the statute had an aggregate focus. 712 F.3d at 1201.

Section 23(A) is likewise part of a substantial compliance regime. The Secretary is directed to discontinue payments to a State if he finds that "in the administration of the plan there is a failure to comply substantially" with a provision of § 1396a. 42 U.S.C. § 1396c(2). Although *Wilder* identified an enforceable right in former § 13(A) of the Medicaid Act despite the statute's substantial compliance requirement, *see Midwest Foster Care*, 712 F.3d at 1201, we put little stock in that paradigm after *Armstrong*'s express disavowal of *Wilder*'s mode of analysis. There is stronger reason after *Armstrong* to infer an aggregate focus for § 1396a(a)(23)(A) based on the substantial compliance funding requirement of § 1396c.

The Jane Does, citing decisions of other circuits, rely on the fact that § 23(A) refers to "any *individual* eligible for medical assistance," and that the Medicaid Act speaks in mandatory language when it says that a state plan "must" provide for an individual to obtain assistance from a qualified provider. 42 U.S.C. § 1396a(a). They say that this text includes the sort of "rights-creating language" that supports an action under § 1983. *See Planned Parenthood of Gulf Coast, Inc. v. Gee*, No. 15-30987, 2017 WL 2805637, at *7-8 (5th Cir.), *petition for reh'g filed*, No. 15-30987 (July 13, 2017); *Planned Parenthood Ariz. Inc. v. Betlach*, 727 F.3d 960, 966-67 (9th Cir. 2013); *Planned Parenthood of Ind., Inc. v. Comm'r of the Ind. State Dep't of Health*, 699 F.3d 962, 974-76 (7th Cir. 2012); *Harris v. Olszewski*, 442 F.3d 456, 461-62 (6th Cir. 2006).

In our view, this analysis gives insufficient weight to *Gonzaga*'s requirement of unambiguous intent and to the factors that we have discussed above: the reference

to an "individual" is nested within one of eighty-three subsections and is two steps removed from the Act's focus on which state plans *the Secretary* "shall approve," 42 U.S.C. § 1396a(b); Congress directly and indirectly established other means of enforcing compliance, 42 U.S.C. § 1396c, 42 C.F.R. § 1002.213; and the substantial compliance funding condition of § 1396c suggests an aggregate focus. Where structural elements of the statute and language in a discrete subsection give mixed signals about legislative intent, Congress has not spoken—as required by *Gonzaga*, 536 U.S. at 280—with a "clear voice" that manifests an "'unambiguous' intent" to confer individual rights. *See John B. v. Goetz*, 626 F.3d 356, 361-62 (6th Cir. 2010) (per curiam) (observing that a comparable argument based on the Act as a whole "has considerable support in the language of the statute," but concluding that it was foreclosed by circuit precedent).[4]

The dissent, *post*, at 26, asserts that it is "inappropriate" to consider the fact that § 1396a(a) is part of a directive to the Secretary, and proposes to decide the existence of an enforceable federal right based on a sentence fragment in § 1396a(a)(23). The dissent's approach runs counter to basic rules of statutory interpretation. "Perhaps no interpretive fault is more common than the failure to follow the whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012). The proper inquiry is whether Congress intended to create an enforceable federal right when it enacted the specific provision in question. Congressional intent or meaning is not discerned by considering merely a portion of a statutory provision in isolation, but rather by reading the complete provision in the

_____

[4]Because we conclude that Congress did not unambiguously confer a federal right that is presumptively enforceable under § 1983, we do not adopt the view attributed to us by the dissent, *post*, at 26, that Congress adopted a comprehensive administrative scheme that precludes private enforcement under § 1983. *See Gonzaga*, 536 U.S. at 284 n.4.

context of the statute as a whole.  *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997); *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989); *K-Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988).

The decisions of other courts also can be explained in part by an evolution in the law.  The authorities cited by the Jane Does rely significantly (and in the pre-2015 decisions, understandably) on the Supreme Court's analysis in the now-repudiated *Wilder* decision.  *See Planned Parenthood of Ind.*, 699 F.3d at 976 ("Indiana's position is hard to reconcile with *Wilder* . . . ."); *Harris*, 442 F.3d at 463 ("Our conclusion . . . comports with decisions of the Supreme Court [and other courts] that have recognized privately enforceable rights under § 1983 stemming from similar statutory language in the Medicaid Act.") (citing *Wilder*, 496 U.S. at 510, 524); *see also Gee*, 2017 WL 2805637, at *9 (following the Sixth and Seventh Circuits); *Betlach*, 727 F.3d at 966-67 (same).  The Third Circuit in 2004 similarly relied on *Wilder* in reversing a district court's decision that §§ 1396a(a)(8), 1396a(a)(10), and 1396d(a)(15) did not unambiguously create enforceable rights in light of *Gonzaga*.  *Sabree ex rel. Sabree v. Richman*, 367 F.3d 180, 184, 192-93 (3d Cir. 2004).  A concurring opinion, however, suggested that the result might not endure:  "While the analysis and decision of the District Court may reflect the direction that future Supreme Court cases in this area will take, currently binding precedent supports the decision of the Court."  *Id*. at 194 (Alito, J., concurring).[5]

_____

[5]The district court in *Sabree* concluded:

> Because Title XIX speaks more in terms of what a State must do to make itself eligible for funding versus the individual treatment of recipients, and because the State need only "comply substantially" with statutory provisions to receive funding, the Secretary's function is to assess the "aggregate function of the State," rather than "whether the needs of any particular person have been satisfied."

*Sabree ex rel. Sabree v. Houston*, 245 F. Supp. 2d 653, 660 (E.D. Pa. 2003) (citation

-13-

In support of the view that Congress intends private enforcement of § 23(A) under § 1983, *amici* National Health Law Program, et al., direct our attention to 42 U.S.C. § 1320a-2. That section, enacted in 1994, provides:

> In an action brought to enforce a provision of [the Social Security Act], such provision is not to be deemed unenforceable because of its inclusion in a section of [the Act] requiring a State plan or specifying the required contents of a State plan. This section is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements other than by overturning any such grounds applied in Suter v. Artist M., 112 S. Ct. 1360 (1992), but not applied in prior Supreme Court decisions respecting such enforceability; provided, however, that this section is not intended to alter the holding in Suter v. Artist M. that section 671(a)(15) of [the Act] is not enforceable in a private right of action.

The Ninth Circuit found that this text was "hardly a model of clarity." *Sanchez v. Johnson*, 416 F.3d 1051, 1057 n.5 (9th Cir. 2005). The operative first sentence addresses and apparently disapproves one portion of *Suter*: the Court had suggested that when a provision of the Adoption Assistance and Child Welfare Act required a state plan and specified the mandatory elements of a plan, it required only that a State have a plan approved by the Secretary which contained those features, not that the plan actually be in effect. *Suter*, 503 U.S. at 358; *see* Brief of National Health Law Program, et al. as *Amici Curiae* at 15.[6] We do not rely on this aspect of *Suter*; we

---

omitted); *see also Grammer v. John J. Kane Reg'l Ctrs.-Glen Hazel*, 570 F.3d 520, 533 (3d Cir. 2009) (Stafford, J., dissenting).

[6]The Conference Report on § 1320a-2 quotes a portion of *Suter* stating that 42 U.S.C. § 671(a) "only goes so far as to ensure that the States have a plan approved by the Secretary which contains the listed 16 features" before explaining the "intent" of the statute:

> The intent of this provision is to assure that individuals who have been

assume that the State must have a plan that is in effect. The second sentence of § 1320a-2 declares what is "intended" by the statute, but does not include an operative provision that adds to the specific direction of the first sentence. *See* Scalia & Garner, *supra*, at 219-20 (explaining that "an expansive purpose . . . cannot add to the specific dispositions of the operative text," whether the expression of purpose is contained in a preface or in the body of the text); *cf. FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 775 n.6 (2016) ("The operative provision is what counts."). In any event, other points discussed in *Suter*, including the requirement of unambiguous notice to States about conditions on the receipt of federal funds and the significance of an alternative enforcement mechanism, were relevant considerations before *Suter* and are beyond the scope of § 1320a-2. *See LaShawn A. v. Barry*, 69 F.3d 556, 569 (D.C. Cir. 1995), *vacated*, 74 F.3d 303, *and rev'd en banc on other grounds*, 87 F.3d 1389 (D.C. Cir. 1996). The statute provides that Congress did not intend to alter the holding of *Suter*, and the provision leaves undisturbed enough of *Suter*'s rationale to justify the holding.

Because § 1320a-2 was adopted seven years before *Gonzaga* clarified the law in this area, moreover, the statute does not address the same question that a court must

---

> injured by a State's failure to comply with the Federal mandates of the State plan titles of the Social Security Act are able to seek redress in the federal courts to the extent they were able to prior to the decision in Suter v. Artist M., while also making clear that there is no intent to overturn or reject the determination in Suter that the reasonable efforts clause to Title IV-E does not provide a basis for a private right of action.

H.R. Rep. No. 103-761, at 924, 926 (1994) (Conf. Rep.); *see also* H.R. Rep. No. 102-631, at 366 (1992) (stating that a predecessor bill with virtually identical language "only alters that portion of Suter v. Artist M. suggesting that failure of a state to comply with a state plan provision is not litigable as a violation of federal statutory rights").

decide today.  Section 1320a-2 speaks to when a "provision" is "deemed unenforceable"; we must decide whether a statute unambiguously "confers an individual right" that can be enforced under § 1983.  *Gonzaga*, 536 U.S. at 284.  We know that § 1320a-2 did not freeze the law as it was before *Suter* in 1992:  *Armstrong* confirmed that the 1990 *Wilder* decision has been repudiated by post-1994 precedent.  *See also Sanchez*, 416 F.3d at 1057 n.5 (concluding that a court must apply *Blessing* and *Gonzaga*, which followed the enactment of § 1320a-2, in determining whether a provision of the Medicaid Act confers an individual right); *Harris v. James*, 127 F.3d 993, 1002 (11th Cir. 1997) (rejecting the proposition that courts must "determine the 'federal rights' question only according to the pre-*Suter* precedents").

Section 1320a-2 does not show that § 23(A) of the Medicaid Act creates an enforceable right.  This court in *Midwest Foster Care* interpreted § 1320a-2 to mean that a provision of the Act "cannot be deemed individually unenforceable solely because of its situs in a larger regime 'requiring a State plan or specifying the required contents of a state plan.'"  712 F.3d at 1200 (quoting 42 U.S.C. § 1320a-2).  This does not mean that we should ignore the elements of the text discussed above—the structure of the statute and its focus on a federal regulator who is two steps removed from individual patients, the availability of alternative means to enforce compliance with the requirements of § 23(A), and the aggregate focus of the statute in light of its connection between funding and substantial compliance with the condition.  Where a provision is included in a section of the Act requiring a state plan or specifying the required contents of a state plan, Congress still must create new rights in clear terms that show unambiguous intent before they are enforceable under § 1983.  Conflicting textual cues are insufficient.

The plurality opinion in Part IV of *Armstrong* fortifies this conclusion.  Four Justices considered whether Medicaid providers had a cause of action under the Medicaid Act itself to enforce § 30(A) of the Act.  The first step in that analysis was

-16-

to determine whether Congress intended to confer individual rights upon a class of beneficiaries—the same inquiry that informs whether a statute confers rights enforceable under § 1983. *Gonzaga*, 536 U.S. at 285. The *Armstrong* plurality concluded that § 30(A) lacked "rights-creating language," because it was "phrased as a directive to the federal agency charged with approving state Medicaid plans, not as a conferral of the right to sue upon the beneficiaries of the State's decision to participate in Medicaid." 135 S. Ct. at 1387 (citing 42 U.S.C. § 1396a(b)). To accept *amici*'s suggestion here that § 1320a-2 precludes this analysis would require us to conclude that the *Armstrong* plurality overlooked § 1320a-2 or misunderstood it. Neither is likely.[7]

The lack of a judicially enforceable federal right for Medicaid patients does not mean that state officials have unfettered authority to terminate providers. Patients can receive services only from a willing provider. Medicaid providers whose contracts are terminated but who wish to continue providing services have an obvious incentive to pursue administrative appeals and judicial review in state court if the alternative avenue of recruiting patients to sue in federal court is not available. Providers and patients also may urge the Secretary to withhold federal funds from a State that fails to comply substantially with the condition of § 23(A). The absence of a remedy for patients under § 1983 therefore does not make the free-choice-of-provider provision an empty promise. We conclude only that Congress did not unambiguously confer the particular right asserted by the patients in this case.

---

[7]The respondents, the Solicitor General, and several other *amici* brought § 1320a-2 to the Court's attention in *Armstrong*. Brief for Respondents at 43, *Armstrong*, 135 S. Ct. 1378 (No. 14-15); Brief for the United States as *Amicus Curiae* at 29-30; Brief for American Ass'n of People with Disabilities, et al. as *Amici Curiae* at 15-16; Brief for American Medical Ass'n, et al. as *Amici Curiae* at 27-32; Brief for American Network of Community Options & Resources, et al. as *Amici Curiae* at 7, 19-24.

Given our conclusion that § 23(A) of the Medicaid Act does not give the Jane Does or the class of Medicaid beneficiaries an enforceable federal right that supports a cause of action under § 1983, the plaintiffs do not have a likelihood of success on the merits of their claims. We need not address the Director's alternative contention that the Jane Does failed to show that irreparable harm would result from the denial of an injunction because other qualified providers could provide the services that they seek. Without a likelihood of success on the merits, an injunction is not justified. The orders of the district court enjoining the Arkansas Department of Human Services from suspending Medicaid payments are therefore vacated.

SHEPHERD, Circuit Judge, concurring.

I concur in the court's opinion today, but I write separately to present an alternative ground for reversal. In my view, even if § 23(A) provides a substantive right that the plaintiffs can enforce through a § 1983 suit, the right provided is to a range of qualified providers—not the right to a particular provider the State has decertified. For this alternative reason, the plaintiffs' § 1983 claim fails.

Assuming that § 23(A) grants the plaintiffs a private right of action, we must examine the precise contours of that right. Cf. Gonzaga Univ. v. Doe, 536 U.S. 273, 280 (2002) (requiring that conferred benefits be sufficiently specific and definite to qualify as enforceable rights). The plaintiffs frame the right as an absolute right to use the qualified provider of their own choosing without governmental interference. Because Arkansas decertified Planned Parenthood—plaintiffs' preferred healthcare provider—as a qualified provider, the plaintiffs allege they have a right under § 23(A) to challenge that decertification.

But the Supreme Court's decision in O'Bannon v. Town Court Nursing Center, 447 U.S. 773 (1980), tells us the right created by § 23(A) is far more narrow: the

right to choose among a range of qualified providers. O'Bannon involved Medicaid recipients residing in a nursing home that initially qualified as a Medicaid provider. Id. at 775. After the nursing home was decertified and removed from the list of qualified providers, residents brought suit, alleging a constitutional right to an evidentiary hearing on the merits of the decertification decision. The Supreme Court rejected this argument. Analyzing the "substantive right" provided by § 23(A), the Court held that "the Medicaid provisions . . . do not confer a right to continued residence in the home of one's choice." Id. at 785-86. Section 23(A), the Court explained, "gives recipients the right to choose among a range of *qualified* providers, without government interference." Id. at 785. So long as the provider remains qualified, therefore, Medicaid recipients remain free to stay there. But § 23(A) "clearly does not . . . confer a right on a recipient to continue to receive benefits for care in a home that has been decertified." Id. In sum, the Court carefully delineated the limits of the right conferred by § 23(A); there is no enforceable right of continued care from a provider determined by the state to be unqualified.

I see two important takeaways from O'Bannon. First, the contours of the right granted by § 23(A) are circumscribed. Medicaid recipients have the enforceable right to a range of qualified providers. So state agencies cannot steer patients to certain qualified providers at the expense of other qualified providers. Nor can an agency artificially create a monopoly in Medicaid care.[8] But there exists no right to a particular provider the State has decertified. Second, § 23(A) does not give Medicaid

[8]For these reasons, the dissent's complaint about my construction of the right granted by § 23(A)— that it would be "self-eviscerating"—is unfounded. Section 23(A) protects Medicaid recipients from government interference in their choice of a qualified provider, examples of which I have described in the text above. Were the State to so interfere, the plaintiffs would have the right to challenge the State's actions. So the right granted by § 23(A) is real and meaningful. It simply doesn't have the meaning the dissent wishes it to have.

recipients the right "to challenge *the merits* of a State's assertion that a provider of Medicaid services is no longer qualified to provide Medicaid services or to challenge the State's termination of a provider's Medicaid agreements on the basis of the provider's noncompliance with state and federal regulatory requirements." Planned Parenthood of Gulf Coast, Inc. v. Gee, No. 15-30987, 2017 WL 2805637, at *20 (5th Cir. June 29, 2017) (Owen, J., dissenting). The O'Bannon Court explained that "decertification does not reduce or terminate a patient's financial assistance, but merely requires him to use it for care at a different facility." 447 U.S. at 785-86. "Because the patients had no *substantive* right to demand care from a provider that had been decertified, they had no due process rights to participate in a hearing regarding certification or decertification of the provider." Gee, 2017 WL 2805637, at *21 (Owen, J., dissenting).

O'Bannon controls the outcome of this case. The plaintiffs are asserting a right—the absolute right to a particular provider of their choosing—that § 23(A) does not grant them. The rights granted to these plaintiffs under the statute, as explained by O'Bannon, remain intact because the record confirms that they still have access to a range of qualified providers. Further, the plaintiffs have no right under federal law to collaterally attack the merits of Arkansas's decision to decertify Planned Parenthood. Planned Parenthood had the right to challenge that decision, but instead elected not to do so.

The plaintiffs argue on appeal that O'Bannon concerned "only a procedural due process claim," and therefore we should not consider it controlling because the plaintiffs in this case assert a violation of a substantive right. To be sure, some of our fellow circuit courts have agreed with this view. See Gee, 2017 WL 2805637, at *9 (distinguishing O'Bannon because it involved procedural due process rights and not substantive rights); Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health, 699 F.3d 962, 977 (7th Cir. 2012) (same).

-20-

This view, however, is patently flawed because it ignores the very language of O'Bannon. The Supreme Court clearly stated that it was defining the contours of the "substantive right . . . conferred by the statutes and regulations." O'Bannon, 447 U.S. at 786. We, as courts of appeals, have no authority to dismiss binding precedent from the highest court in the land, especially when that precedent is on point. See Hennepin Cnty. v. Fed. Nat'l Mortg. Ass'n, 742 F.3d 818, 823 (8th Cir. 2014) ("Lower courts must follow Supreme Court precedent which directly applies to a case before them . . . .").

The plaintiffs' argument also exhibits a fundamental misunderstanding of due process rights. Any right to due process, whether asserted as a procedural or substantive claim, exists only when there is an underlying substantive right at issue. See Gee, 2017 WL 2805637, at *21 (Owen, J., dissenting) ("[T]here is no right to due process unless there is a substantive right that may be vindicated if adequate process is accorded."). The O'Bannon plaintiffs' procedural due process claim required a showing that the State had deprived them of "life, liberty, or property." See U.S. Const. amend. XIV. They identified § 23(A) as the source of their due process rights. See O'Bannon, 447 U.S. at 784-85 (discussing § 23(A) as one of two sources identified by the plaintiffs as providing a substantive right). The Supreme Court thus examined whether § 23(A) provides Medicaid recipients the right to receive healthcare services from a particular provider the State has decertified. The Court concluded that no such right exists. Id. at 785-86. On this basis—the lack of a substantive right to a particular, decertified provider—the Court denied the plaintiffs' procedural due process claim. Id. The O'Bannon Court's reasoning and decision apply with equal force to the plaintiffs' present claim, and for this alternative reason I would reverse the district court.

The dissent contends that I misunderstand the plaintiffs' argument. It then explains that the plaintiffs are not claiming that § 23(A) entitles them to choose a

provider rightfully disqualified from the pool of Medicaid providers, but rather they argue that Arkansas's decertification of Planned Parenthood as a qualified provider constitutes government interference with their freedom of choice. O'Bannon, therefore, is supposedly inapposite. See Gee, 2017 WL 2805637, at *10 ("[T]he [O'Bannon] plaintiffs had no right to reside in an unqualified facility when the disqualification decision was connected to the state's enforcement of its health and safety regulations.").

The dissent's attempt to distinguish O'Bannon fails because it assumes that Planned Parenthood was somehow *wrongfully* disqualified as a Medicaid provider. The dissent claims to find proof of this wrongful termination in the fact that Planned Parenthood remains licensed to serve other patients. So according to the dissent, a Medicaid recipient has the right to challenge the merits of a provider's decertification when the State permits that provider to continue providing care to other patients. But this interpretation is plainly wrong. "Under federal statutory and regulatory provisions, a State may terminate a provider's Medicaid agreement on many grounds, and it is not a prerequisite for such terminations that the State preclude a provider from providing services to any and all patients." Gee, 2017 WL 2805637, at *22 (Owen, J., dissenting); see also 42 U.S.C. § 1396a(p)(1) ("In addition to any other authority, a State may exclude any individual or entity for purposes of participating under the State plan under this subchapter for any reason for which the Secretary could exclude the individual or entity from participation in a program under subchapter XVII of this chapter under section 1320a-7, 1320a-7a, or 1395cc(b)(2) of this title."). And O'Bannon's holding did not rest on whether the State allowed the nursing home to continue servicing other patients. The Court based its decision on the State's termination of the nursing home's Medicare provider agreement. O'Bannon, 447 U.S. at 776. So O'Bannon remains controlling over this case.

MELLOY, Circuit Judge, dissenting.

Because I would join the four other circuit courts and numerous district courts that all have found a private right of enforcement under 42 U.S.C. § 1396a(a)(23)(A), I respectfully dissent. See Planned Parenthood of Gulf Coast, Inc. v. Gee, 862 F.3d 445 (5th Cir. 2017); Planned Parenthood Ariz. Inc. v. Betlach, 727 F.3d 960 (9th Cir. 2013); Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health, 699 F.3d 962 (7th Cir. 2012); Harris v. Olszewski, 442 F.3d 456 (6th Cir. 2006).

In Blessing v. Freestone, 520 U.S. 329 (1997), the Supreme Court set forth a three-factor test to determine whether a statutory provision creates a private right of action enforceable under 42 U.S.C. § 1983. Under that test, we consider (1) whether "Congress . . . intended that the provision in question benefit the plaintiff"; (2) whether the right "is not so vague and amorphous that its enforcement would strain judicial competence"; and (3) whether the provision "impose[s] a binding obligation on the States." Blessing, 520 U.S. at 340–41 (citation and internal quotation marks omitted). Later, in Gonzaga University v. Doe, 536 U.S. 273, 283 (2002), the Court amended the first prong of the analysis, holding that nothing "short of an unambiguously conferred right [will] support a cause of action brought under § 1983."

This court has applied the Blessing test a number of times to other statutory provisions. See Spectra Commc'ns Grp., LLC v. City of Cameron, 806 F.3d 1113 (8th Cir. 2015) (finding no private right of action under 47 U.S.C. § 253); Midwest Foster Care & Adoption Ass'n v. Kincade, 712 F.3d 1190 (8th Cir. 2013) (finding no private right of action under 42 U.S.C. § 672(a)(1)); Ctr. for Special Needs Trust Admin., Inc. v. Olson, 676 F.3d 688 (8th Cir. 2012) (finding a private right of action under 42 U.S.C. § 1396p(d)(4)(C)); Lankford v. Sherman, 451 F.3d 496 (8th Cir. 2006) (finding no private right of action under 42 U.S.C. § 1396a(a)(17)); Walters v.

Weiss, 392 F.3d 306 (8th Cir. 2004) (finding no private right of action under 42 U.S.C. § 657(a)); Mo. Child Care Ass'n v. Cross, 294 F.3d 1034 (8th Cir. 2002) (finding a private right of action under 42 U.S.C. § 672); Pediatric Specialty Care, Inc. v. Ark. Dep't of Human Servs., 293 F.3d 472 (8th Cir. 2002) (finding a private right of action under 42 U.S.C. §§ 1396a(a)(10)(A), (a)(43), and 1396d(a, r)). Although the majority focuses on the Gonzaga analysis, I do not read the majority opinion to suggest that Blessing has been overruled.

Applying the Blessing/Gonzaga framework in the present case, I would hold that 42 U.S.C. § 1396a(a)(23)(A), the "freedom-of-choice provision," does create a private right of action. This provision unambiguously confers an individual right to Medicaid-eligible patients. Section 23(A) states that "any *individual* eligible for medical assistance" can obtain that assistance from a provider of their choice. 42 U.S.C. § 1396a(a)(23)(A) (emphasis added). Thus, this provision is "phrased in terms of the persons benefitted," Gonzaga, 536 U.S. at 284 (quoting Cannon v. Univ. of Chi., 441 U.S. 677, 692 & n.13 (1979)), and uses "individually focused terminology," id. at 287. See O'Bannon v. Town Court Nursing Ctr., 447 U.S. 773, 785 (1980) (The freedom-of-choice provision "*gives recipients the right* to choose among a range of qualified providers, without government interference. By implication, it also confers an absolute right to be free from government interference with [that] choice[.]" (emphasis added and omitted)); see also Gee, 862 F.3d at 459; Betlach, 727 F.3d at 966–67; Planned Parenthood of Ind., 699 F.3d at 974; Harris, 442 F.3d at 461–62.

Further, the freedom-of-choice provision "is not so vague and amorphous that its enforcement would strain judicial competence." Blessing, 520 U.S. at 340–41 (citation and internal quotation marks omitted). The provision states that a Medicaid-eligible individual "may obtain . . . assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required . . . , who undertakes to provide him such services." 42 U.S.C. § 1396a(a)(23)(A).

Thus, there are two criteria providers must meet: (1) the provider must be "qualified to perform the service or services required"; and (2) the provider must "undertake[ ] to provide . . . such services." Id. As the Ninth Circuit stated, "the two criteria do not require courts to engage in any balancing of competing concerns or subjective policy judgments, but only to answer factual yes-or-no questions: Was an individual denied the choice of a (1) qualified and (2) willing provider? The answer to these questions is 'likely to be readily apparent.'" Betlach, 727 F.3d at 967 (quoting Harris, 442 F.3d at 462). The Ninth Circuit further explained:

> A court can readily determine whether a particular health care provider is qualified to perform a particular medical service, drawing on evidence such as descriptions of the service required; state licensing requirements; the provider's credentials, licenses, and experience; and expert testimony regarding the appropriate credentials for providing the service. This standard is not subjective or amorphous, and requires no balancing. It is no different from the sorts of qualification or expertise assessments that courts routinely make in various contexts.

Id. at 968 (footnote omitted). And as the Sixth Circuit noted, "while there may be legitimate debates about the medical care covered by or exempted from the freedom-of-choice provision, the mandate itself does not contain the kind of vagueness that would push the limits of judicial enforcement." Harris, 442 F.3d at 462.

Moreover, the freedom-of-choice provision is a mandatory provision. Under the provision, states "must provide" the free choice of providers to Medicaid-eligible individuals. As a result, the freedom-of-choice provision unambiguously refers to Medicaid-eligible individuals and confers an individual entitlement: the right to receive medical services from any qualified provider of their choice. See Planned

Parenthood of Ind., 699 F.3d at 974. Thus, I would hold that § 1396a(a)(23)(A) unambiguously creates a presumption of a private right enforceable under § 1983. See Gonzaga, 536 U.S. at 284 ("Once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983.").

"The State may rebut this presumption by showing that Congress 'specifically foreclosed a remedy under § 1983.'" Id. at 284 n.4 (quoting Smith v. Robinson, 468 U.S. 992, 1004–05 & n.9 (1984)). "Congress may do so expressly, by forbidding recourse to § 1983 in the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." Blessing, 520 U.S. at 341. The major thrust of the majority's opinion appears to rest on a finding that the Medicaid Act's regulatory scheme rebuts any presumption of private enforceability. For several reasons, I disagree that the regulatory scheme is so comprehensive as to be a clear expression of Congress's intent to preclude private enforcement.

First, the majority, *ante*, at 8–10, finds that the freedom-of-choice provision does not unambiguously confer an individual right. In so finding, the majority considers the Medicaid Act as a whole to find that the freedom-of-choice provision is part of a directive to the Secretary of Health and Human Services. Such a broad focus is inappropriate. See Blessing, 520 U.S. at 342 ("We [do] not ask whether the federal . . . legislation generally [gives] rise to rights; rather, we focus[ ] our analysis on a specific statutory provision . . . ."); Golden State Transit Corp. v. City of L.A., 493 U.S. 103, 106 (1989) (asking whether the "provision in question" was designed to benefit the plaintiff). And such a broad analysis cannot stand because it is inconsistent with circuit precedent, which has found a private right of action under other provisions of the Medicaid Act. See Olson, 676 F.3d at 699–700 (finding a private right of action to enforce the Medicaid Act's pooled trusts provision under 42 U.S.C. § 1396p(d)(4)(C)); Pediatric Specialty Care, 293 F.3d at 478–79 (finding a

-26-

private right of action to challenge proposed state budget cutbacks that would violate the right to early and periodic screening, diagnosis, and treatment services under 42 U.S.C. §§ 1396a(a)(10)(A), (a)(43), and 1396d(a, r)).

Second, the majority, *ante*, at 9, states that "[b]ecause other sections of the Act provide mechanisms to enforce the State's obligation under § 23(A) to reimburse qualified providers who are chosen by Medicaid patients, it is reasonable to conclude that Congress did not intend to create an enforceable right for individual patients under § 1983." However, "[t]he availability of administrative mechanisms to protect the plaintiff's interests" alone cannot defeat the plaintiff's ability to invoke § 1983 so long as the other requirements of the three-part test are met. Blessing, 520 U.S. at 347 (alteration in original) (quoting Golden State Transit Corp., 493 U.S. at 106).

Third, the majority, *ante*, at 10–11, finds private enforcement foreclosed because § 23(A) is "part of a substantial compliance regime." Thus, according to the majority, we can "infer an aggregate focus for" § 23(A). I disagree that the substantial compliance regime supports a finding that Congress intended to foreclose private enforcement. In Blessing, the Court concluded that the enforcement scheme under Title IV–D of the Social Security Act was not sufficiently comprehensive to foreclose § 1983 liability. 520 U.S. at 348. In so concluding, the Court noted the lack of any "private remedy—either judicial or administrative—through which aggrieved persons can seek redress." Id. Further, the Court found that the Secretary of Health and Human Services' "limited powers to audit [for substantial compliance] and cut federal funding" were not enough to foreclose private enforcement. Id. Similarly, in this case, the Secretary's power to cut funding if a State is not in substantial compliance with § 1396a is not enough to foreclose private enforcement. And while a provider in Arkansas may file an administrative appeal and then seek judicial review of Arkansas's decision to terminate the provider's contract under

-27-

Arkansas law, there is no remedy available for Medicaid-eligible individuals harmed by the termination decision.

Fourth, the majority relies on Armstrong v. Exceptional Child Center Inc., 135 S. Ct. 1378 (2015), in reaching its decision. I do not read Armstrong to overrule or even undermine the reasoning of the other circuits that have addressed whether § 23(A) creates a private right of action under § 1983. Armstrong involved the Supremacy Clause and a claim for equitable relief under 42 U.S.C. § 1396a(a)(30)(A). There, it was undisputed that § 1983 was not an available remedy, as § 30(A) does not have any rights-creating language nor does it refer to individual Medicaid beneficiaries. Specifically, § 30(A) requires state Medicaid plans to:

> provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area . . . .

42 U.S.C. § 1396a(a)(30)(A). The Supreme Court held that

> [t]he provision for the Secretary's enforcement by withholding funds might not, *by itself*, preclude the availability of equitable relief. But it does so when combined with the judicially unadministrable nature of § 30(A)'s text. It is difficult to imagine a requirement broader and less specific than § 30(A)'s mandate that state plans provide for payments that are "consistent with efficiency, economy, and quality of care," all the while "safeguard[ing] against unnecessary utilization of . . . care and services."

Armstrong, 135 S. Ct. at 1385 (second alteration and omission in original) (citation omitted) (quoting 42 U.S.C. § 1396a(a)(30)(A)).  In contrast, § 23(A) has only two criteria, neither of which are too broad or too general for courts to consider.  Thus, "[t]he provision for the Secretary's enforcement by withholding funds" does not preclude private enforcement under § 1983.

Finally, to the extent the majority discounts the four other circuits that have found a private right of action under the freedom-of-choice provision based upon an alleged evolution of law, *ante*, at 12, I disagree.  The majority asserts that the Supreme Court's opinions in Gonzaga and Armstrong overruled Wilder v. Virginia Hospital Association, 496 U.S. 498 (1990).  In Wilder, the Court held that the Boren Amendment to the Medicaid Act created a private right of action because it "was intend[ed] to benefit the putative plaintiff."  Id. at 509 (alteration in original) (citation omitted).  I do not dispute the fact that Gonzaga amended that prong of the Blessing test.  See Gonzaga, 536 U.S. at 283 ("We now reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983.").  But I do not read the other circuits' opinions to rely on Wilder in such a manner as to make those cases bad law.

The Fifth, Sixth, Seventh, and Ninth Circuits all applied the Blessing/Gonzaga framework to hold that the freedom-of-choice provision creates a private right enforceable under § 1983.  Gee, 862 F.3d at 457–61; Betlach, 727 F.3d at 966–67; Planned Parenthood of Ind., 699 F.3d at 972–74; Harris, 442 F.3d at 461–63.  Notably, all of these opinions were issued after Wilder was, as the majority claims, overruled by Gonzaga.  Further, only two of these opinions rely on Wilder.  Planned Parenthood of Ind., 699 F.3d at 969, 974–76; Harris, 442 F.3d at 461, 463.  And where those opinions do rely on Wilder, they do so for propositions that are unchallenged by subsequent caselaw.  See Planned Parenthood of Ind., 699 F.3d at 969 ("Medicaid 'is a cooperative federal-state program through which the Federal

-29-

Government provides financial assistance to States so that they may furnish medical care to needy individuals.'" (quoting Wilder, 496 U.S. at 502)); id. at 974–75 (relying on Wilder to find that the Medicaid Act's regulatory scheme was not sufficiently comprehensive to show Congressional intent to preclude § 1983 enforcement, the underlying reasoning of which is also supported by Blessing); Harris, 442 F.3d at 463 (same). Most importantly, as noted above, all four circuits concluded, as required by Gonzaga, that the freedom-of-choice provision *unambiguously* confers a private right of action under § 1983. Gee, 862 F.3d at 458–59; Betlach, 727 F.3d at 966; Planned Parenthood of Ind., 699 F.3d at 974; Harris, 442 F.3d at 461. I therefore read those circuits' opinions as persuasive authority that cannot be discounted by an alleged evolution of Supreme Court precedent.

I also disagree with the concurrence's alternative argument for reversing the district court. O'Bannon held:

> When enforcement of [minimum standards of care] requires decertification of a facility, there may be an immediate, adverse impact on some residents. But surely that impact, which is an indirect and incidental result of the Government's enforcement action, does not amount to a deprivation of any interest in life, liberty, or property.

447 U.S. at 787. As the Fifth Circuit recently explained, "the [O'Bannon] plaintiffs had no right to reside in an unqualified facility *when the disqualification decision was connected to the state's enforcement of its health and safety regulations*." Gee, 862 F.3d at 461. The language of the freedom-of-choice provision supports this understanding because the word "qualified" is modified by the phrase "to perform the service or services required." 42 U.S.C. § 1396(a)(23)(A). "The provision thus indexes the relevant 'qualifications' not to any Medicaid-specific criteria (whether imposed by the federal government or the states), but to factors external to the

-30-

Medicaid program; the provider's competency and professional standing as a medical provider generally." Betlach, 727 F.3d at 969.

Here, like in Gee, Arkansas did not decertify Planned Parenthood as a medical provider. Rather, the state terminated only Planned Parenthood's Medicaid Provider Agreement; Planned Parenthood is still licensed to serve other patients. See Gee, 862 F.3d at 461 (discussing the State's actions and explaining that "[t]he Individual Plaintiffs in this case are trying to sustain their 'right to choose among a range of *qualified* providers, without government interference'—a right explicitly recognized in O'Bannon." (quoting O'Bannon, 447 U.S. at 785 (emphasis in original))). The plaintiffs in this case do not claim that the freedom-of-choice provision entitles them to choose a provider rightfully disqualified from the pool of Medicaid providers. See Planned Parenthood of Ind., 699 F.3d at 978–80 (discussing the State's limited authority to disqualify providers). Instead, they argue that Arkansas's termination of the Medicaid Provider Agreement constitutes government interference with their freedom of choice. If the right is given the construction the concurrence suggests, "the free-choice-of-provider requirement would be self-eviscerating." Betlach, 727 F.3d at 970; see Planned Parenthood of Ind., 699 F.3d at 978 ("If the states are free to set any qualifications they want—no matter how unrelated to the provider's fitness to treat Medicaid patients—then the free-choice-of-provider requirement could be easily undermined by simply labeling any exclusionary rule as a 'qualification.'"). And while it is true that a state may terminate a Medicaid provider on many grounds, the provision the concurrence cites, 42 U.S.C. § 1396a(p)(1), cross-references other provisions of the Medicaid Act limiting the state's authority to make qualification decisions to "various forms of malfeasance such as fraud, drug crimes, and failure to disclose necessary information to regulators." Planned Parenthood of Ind., 699 F.3d at 979. The provisions do not grant plenary power to the states to make these determinations. Betlach, 727 F.3d at 971–72; Planned Parenthood of Ind., 699 F.3d at 979.

Based on the foregoing discussion, I would hold that the freedom-of-choice provision does create an individual right enforceable under § 1983. That right allows individuals to challenge a state's actions when a provider's Medicaid Agreement is terminated for reasons unrelated to the provider's qualifications. Additionally, I agree with the district court's analysis of the Dataphase factors governing the issuance of an injunction.[9] As a result, I would affirm the orders of the district court enjoining the Arkansas Department of Human Services from suspending Medicaid payments.

_____

_____

[9]Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc) ("[W]hether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.").